IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES A. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-cv-393-MHT |
| | ) | |
| ALLTEL COMMUNICATIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Currently pending before the undersigned Magistrate Judge is Defendant Alltel

Communication, Inc.,'s ("Defendant" or "Alltel") Motion for Summary Judgment (Doc.

#31), supporting Brief (Doc. #32), and evidentiary materials.  Plaintiff James A. Smith

("Plaintiff" or "Smith") has filed a Response (Doc. #34) and additional evidentiary materials.

For the reasons that follow, the Magistrate Judge RECOMMENDS that the Motion for

Summary Judgment (Doc. #31) be GRANTED.

## I.     BACKGROUND

On May 27, 2008, Plaintiff, proceeding *pro se*, filed a form "EEOC Complaint" (Doc.

#1) in which he alleged that Defendant, in violation of Title VII of the Civil Rights Act of

1964, unlawfully terminated his employment on January 6, 2006.[1]  The Complaint alleged

---

[1]     Specifically, Plaintiff indicated in the Complaint that his employment with
Defendant ended on January 6, 2006, and that the alleged discrimination against him
occurred on that same date.  However, elsewhere in the Complaint Plaintiff alleged that
he was "discharged of [his] employment at Alltel Communication on March 12, 2006."

that Sherman M. Fisher, his former supervisor, was the individual responsible for such discrimination.  Plaintiff stated that he was discriminated against based on his race and, in support, alleged that Mr. Fisher, "a white male, prohibited [Plaintiff] and another black male from riding or working together while the other white employees were p[er]mitted to work together and often rode together."  Plaintiff also appeared to allege that the reasons given for his termination, including "actual or threatened deliberate misconduct committed after previous warning," were false because he had not "received any written notification or warnings or no prior disciplinary actions."  Plaintiff further claimed that he filed charges with the Equal Employment Opportunity Commission ("EEOC") on April 20, 2006, and that the EEOC issued him a Notice-of-Right-to-Sue letter which he received on February 29, 2008. Plaintiff also filed a Motion To Proceed In Forma Pauperis (Doc. #2) with his Complaint.

On September 22, 2008, this matter was referred to the undersigned for "consideration and disposition or recommendation on all pretrial matters as may be appropriate."  Order (Doc. #3).  On September 29, 2008, the Court granted Plaintiff's Motion To Proceed In Forma Pauperis. Order (Doc. #4).  On November 18, 2008, Defendant filed an Answer (Doc. #8) to the Complaint, in which Defendant essentially denied any allegation of wrongdoing and asserted forty-one affirmative defenses to Plaintiff's suit.  In advance of the Court's January 13, 2009, scheduling conference, counsel noticed her appearance (Doc. #15) on behalf of Plaintiff.  Subsequently, the Court granted counsel's Motion to Amend (Doc. #20) the Complaint, and the Amended Complaint (Doc. #22) was docketed on February 2, 2009.

Defendant did not file an Amended Answer in response to the Amended Complaint.[2]

Plaintiff's Amended Complaint restates that his suit is brought under Title VII of the Civil Rights Act of 1964, and adds as additional bases for the suit "the 1991 Civil Rights Act, 42 U.S.C. 1981." Amended Complaint (Doc. #22) at ¶¶2-3. In the Amended Complaint, Plaintiff alleged that he filed his EEOC charge on May 10, 2006, and amended it on August 20, 2007. Plaintiff further alleged that "his termination was based upon his race and that any reasons given for his termination are merely pretext and the true reasons are because of his race, African-American." Amended Complaint (Doc. #22) at ¶13. The Amended Complaint does not present any specific factual allegation of discriminatory conduct by Defendant other than Plaintiff's conclusion that his termination was due to his race.

On July 15, 2009, Defendant filed the instant Motion for Summary Judgment (Doc. #31), Brief in Support (Doc. #32), and evidentiary materials. Defendant asserts it is entitled

---

[2]     While Defendant did not file an Amended Answer, Defendant did file a Motion to Strike [the] Jury Demand (Doc. #23) from Plaintiff's Amended Complaint due to Plaintiff's failure to demand a jury in his original complaint. In response to Defendant's Motion, Plaintiff withdrew his jury demand. Response (Doc. #25). Accordingly, the Court granted Defendant's Motion and ordered that the jury demand be stricken from the Amended Complaint. Order (Doc. #26).

The Court further notes that it appears Defendant was not necessarily required to submit an Amended Answer, *see, e.g.*, *Stanley Works v. Snydergeneral Corp.*, 781 F. Supp. 659, 664-65 (E.D. Cal. 1990), as Defendant maintained that Plaintiff's Amended Complaint is "based on the same facts and circumstances, and asserted the same claims, as the Plaintiff's initial Complaint." Motion (Doc. #23) at 1. In acquiescing to Defendant's Motion to Strike, and the underlying assertion that the Amended Complaint presents no new issues, Plaintiff essentially confirmed that Defendant's Answer is sufficient to serve as a response to Plaintiff's Amended Complaint.

to summary judgment for the following reasons:  1) all of Plaintiff's Title VII claims are time-barred; 2) all of Plaintiff's § 1981 claims predating January 29, 2005, are time-barred; 3) Plaintiff cannot establish a *prima facie* case of race discrimination; 4) that Defendant's reasons for terminating Plaintiff's employment are legitimate and non-discriminatory; and 5) after-acquired evidence of Plaintiff's consumption of alcohol while operating his company vehicle forecloses Plaintiff from recovering damages.  On August 4, 2009, Plaintiff filed his Response (Doc. #34) to the Motion and on August 12, 2009, Defendant filed a Reply (Doc. #35).

## II.   STATEMENT OF UNDISPUTED FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of the motions.  The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following relevant facts:

Plaintiff is an African-American male over nineteen years of age.  Defendant is a corporation that provides telecommunication services.  Plaintiff was hired by Defendant in 1994, as an Installation Technician.  Either at the time of his hiring, or during the course of his employment, Plaintiff received copies of the Alltel Employee Handbook, the Ethics in the Workplace Policy,[3] Alltel's Code of Conduct, and Alltel's Working With Integrity

---

[3]      In relevant part, Alltel's Ethics in the Workplace Policy specifically forbids employees from using Alltel "resources to conduct private business" and expressly forbids the falsification or alteration of "any" Alltel records or other documentation.  *See* Ethics In The Workplace, ex. C to Def.'s Mot. For Summ. Judg. (Doc. #31) at 5, 7.

4

Policy.[4]  Plaintiff also received Defendant's "Procedures To Follow When Driving Any Alltel Owned Vehicle."  This policy specifically forbids, "[a]t all times, on and off duty, driving an Alltel vehicle after consuming alcohol" and warns that a violation "will result in automatic suspension and possible termination."  Ex. G to Def.'s Mot. For Summ. Judg. (Doc. #21).

In 1996, Plaintiff was promoted from Installation Technician to Network Technician. Alltel utilized six to seven Network Technicians in servicing the region which includes Montgomery, Alabama.  Network Technicians are responsible for maintaining cell sites in their specified area to ensure their functionality in providing Alltel's communications services.  Plaintiff was assigned the Montgomery Metropolitan Service Area (MSA), which included twenty-one separate cell sites.  The Montgomery MSA "core" functioned as a sort of nerve center for all of Alltel's cell sites in the region.  As such, the proper maintenance of the Montgomery "core" was integral to Alltel's ability to provide its services throughout

---

[4]    In relevant part, the Working With Integrity Policy, in a section titled Integrity Of Company Books and Records, stresses the importance of proper and accurate recording of employees' hours worked in each pay period.  Importantly, it is considered a "Falsification or Alteration of Records" to "inflate payroll hours or transfer hours from one period to another," as in, for example, recording anticipated overtime hours from a future pay period as hours worked during a current pay period.  *See* ex. F to Def.'s Mot. For Summ. Judg. (Doc. #21) at 5-6.  The Working With Integrity Policy also states Defendant's anti-discrimination policy and instructs employees on how to report perceived discrimination so that it may be addressed by the company.  *Id.* at 8 ("If you believe that you have been discriminated against or harassed, you should report that discrimination or harassment to your supervisor, his or her supervisor, your human resources department representative, the Director of Employee Relations, or the ***Working With Integrity*** helpline.").

the region.  Plaintiff was the only African-American Network Technician until some time in 2002, when Michael Jackson was hired as a Network Technician.  Plaintiff's immediate supervisor until September, 2001, was the Network Manager, Robert Walley.  Also during this time, David Green served as Alltel's Regional Vice President of Engineering.  In this position, Mr. Green was responsible for all personnel issues in Plaintiff's "South Area Network," including hiring and firing decisions involving Network Technicians.  Also during this time, Mark Rowe served as Alltel's Director of Engineering.  Mr. Rowe "oversaw the maintenance and repair of wireless networks" and "assisted in the oversight of personnel issues" involving Alltel employees, including Plaintiff.

Mr. Rowe conducted a performance evaluation on Plaintiff in August of 2001.  Mr. Rowe deemed Plaintiff "developing," which was the lowest of the three classifications[5] determined during an evaluation.  *See* Engineering/Technical Non-Exempt Performance Plan, ex. 11 to Pl.'s Resp. (Doc. #34) at 1.  Alltel's evaluation scores the employee's performance in "Core Competencies" and "Behavioral Statement" along a numeric one through seven scale where one is "Trainee" and seven is "Expert."  Plaintiff scored two or less, meaning less than "Proficient," in every category.  *Id.*  Mr. Rowe also noted several "issues" regarding Plaintiff's performance in 2001, including unexplained overtime, tardiness, and lack of expected knowledge.  *Id.* at 2.  Mr. Rowe noted Plaintiff's complaint that he believed his

---

[5]     The three classifications utilized by Alltel were, in descending order, "exceptional," "performing," and "developing."

previous supervisor, supposedly Mr. Walley, had "held him back and did not value him." *Id.* Mr. Rowe resolved not to place Plaintiff on a Performance Improvement Plan ("PIP")[6] at that time, leaving that action to be considered by the then-incoming Network Manager, Sherman Michael Fisher.  Mr. Fisher evidently decided not to place Plaintiff on a PIP.  In the following years, Plaintiff continued working as a Network Technician under Mr. Fisher, and, at least according to Mr. Fisher, flourished as his performance improved from the 2001 evaluation.  Mr. Fisher generally considered Plaintiff a "good team member," and, in annual performance reviews, always deemed Plaintiff "performing" or, in one instance in 2005, "exceptional."  Fisher Dep., ex. L to Def.'s Mot. For Summ. Judg. (Doc. #31) at 20-21. According to Mr. Fisher, Plaintiff "always got merit raises."

During the week including December 29, 2005, Mr. Fisher was on vacation.  In his absence, Mr. Fisher had delegated the task of assigning Network Technicians to handle service outages to Felix Thaggard, a Switch Technician.[7]  On the morning of December 29, 2005, Mr. Thaggard assigned Plaintiff to an outage at a cell site in Tallassee, Alabama.  This site was outside of Plaintiff's assigned area, but it was not unusual for Network Technicians to be assigned to problems at sites outside of their area if they were near the problem site or

---

[6]     According to the deposition testimony of Mr. Fisher, a PIP "is the last step before termination."  Fisher Dep., ex. L to Def.'s Mot. For Summ. Judg. (Doc. #31) at 40 l. 11-19.  After being placed on a PIP, an employee typically has about six months in which to improve their performance or suffer termination.  *Id.*

[7]     As a Switch Technician, Mr. Thaggard would generally be one of the first persons alerted to a problem at a distant cell site which was linked into the switch.

if the technician over that site was unavailable.  Plaintiff visited the Tallassee site but was not able to remedy the problem at that time because he lacked necessary tools or equipment. Plaintiff told Mr. Thaggard that he could not fix the site without certain parts and that he had some things he needed to tend to, including picking-up his wife.  Plaintiff left the Tallassee site and traveled to the Birmingham, Alabama, area in his company vehicle so that he could attend his daughter's high school basketball game and bring his wife back to Montgomery. Smith Dep., ex. B to Def.'s Mot. For Summ. Judg. (Doc. #31) at 92-93.  Plaintiff did not tell Mr. Thaggard that he would be traveling to the Birmingham area for such purposes.  *Id.* at 94 l. 2-8.[8]  Hours later, Mr. Thaggard phoned Plaintiff and assigned another outage, in Lowndesboro, Alabama, to Plaintiff.  Mr. Thaggard assigned this outage to Plaintiff because Lowndesboro is close to Montgomery and he believed Plaintiff was in the Montgomery area. Plaintiff states that he "told Thaggard that he was an hour and a half away, but would get [to Lowndesboro] as soon as possible."  Pl.'s Resp. (Doc. #34) at 14.  Mr. Thaggard eventually dispatched another technician to fix the outages at both the Tallassee and Lowndesboro sites.

---

[8]       It is Plaintiff's contention that he had previously discussed with Mr. Thaggard the prospect of his using "comp time" for a few hours on December 29, 2005. Smith Dep., ex. B to Def.'s Mot. For Summ. Judg. (Doc. #31) at 78 l. 2-21.  Mr. Thaggard has no recollection of such discussion and has testified that he was not empowered to grant "comp time" to Network Technicians.  Thaggard Dep., ex. M to Def.'s Mot. For Summ. Judg. (Doc. #31) at 42 l. 3-8.  Plaintiff also contends that he left for Birmingham with the impression that Mr. Thaggard would be dispatching another technician to the Tallassee site with the required parts.  Smith Dep. at 88 l. 13-22.  Mr. Thaggard states that he believed Plaintiff was going to pick-up the parts, quickly handle his personal matters, and return to the Tallassee site.  Mr. Thaggard believed Plaintiff would remain in the Montgomery area.  Thaggard Dep. at 36 l. 5-17; 43 l. 7-9.

When Plaintiff returned to Montgomery he dropped-off his wife and visited the Lowndesboro site after it had been fixed.  On his time sheet for December 29, 2005, Plaintiff recorded eight hours of regular work, one hour of overtime, and one hour of "on-call" time.   Smith Timesheet, ex. 2 to Fisher Declaration, ex. J to Def.'s Mot. For Summ. Judg. (Doc. #31).[9]  Upon Mr. Fisher's return from vacation the following week, Mr. Thaggard apprised him of the events of December 29, 2005.  As discussed above, *supra* n.4, Alltel policy forbids the recording of past or anticipated overtime as regular hours worked and considers such conduct falsification of records.

During the next week, on January 3, 2006, Plaintiff advised Mr. Fisher that a cell site tower on Troy Highway had a problem with a light.  Because of the height of the tower, Alltel is required to maintain functioning lights as a beacon for aircraft.  When a light is not functioning properly, Alltel is required to notify the Federal Aviation Administration ("FAA") and open a "NOTAM" (Notice To Airmen).  When opening a NOTAM, a technician typically advises the FAA of the location of the tower, its height, and the nature

---

[9]     Even assuming that Plaintiff had previously obtained permission to use "comp time" for any period of hours on December 29, 2005, his recording of eight hours of regular work on that day still constitutes "falsification" of his time sheet because "comp time" is not recorded as hours worked.  Rather, "comp time" is simply hours of leave given the employee to compensate for overtime already worked during that week. Fisher Dep., ex. L to Def.'s Mot. For Summ. Judg. (Doc. #31) at 31-32.  Thus, there is no reporting of "comp time" on an employee's time sheet.  Plaintiff does not contest this characterization of the correct method for implementing "comp time."  Plaintiff also acknowledges completing his time sheet for the week of December 29, 2005, stating that the one hour of overtime he entered accounts for his visit to the Lowndesboro cell site that day.  Smith Dep. at 148 l. 15-23.

of the light problem.  The technician is also required to provide the FAA with his or her

contact information, including name initials and telephone number, in case the FAA needs

to follow-up with the technician.  Mr. Fisher instructed Plaintiff to contact the FAA to open

the NOTAM.  Plaintiff contacted another technician, Bo Walker, and asked him to open the

NOTAM.  Mr. Walker refused but, on January 3, the NOTAM was opened using his contact

information.  Mr. Fisher subsequently investigated the opening of the NOTAM and found

that the NOTAM had been opened with Mr. Walker's contact information.  Mr. Walker

confirmed with Mr. Fisher that he had not opened the NOTAM.  Mr. Fisher then examined

Plaintiff's call records and discovered that Plaintiff had contacted the FAA on January 3, and

that the call lasted one minute and fourteen seconds.[10]  Mr. Fisher also had another

technician, Mr. Jackson, confirm with the FAA that the NOTAM was opened with Mr.

Walker's contact information.  Based on this information, Mr. Fisher determined that

Plaintiff had provided false information to the FAA.

On January 6, 2006, Plaintiff was scheduled to work.  Mr. Fisher had not seen

Plaintiff that afternoon and, knowing that Plaintiff was building a new house, decided to

---

[10]    Plaintiff contends that he would not have given the FAA another
technician's contact information and that, in any event, one minute and fourteen seconds
is not enough time to open a NOTAM with the FAA.  Pl.'s Resp. (Doc. #34) at 16.
However, another technician, Mr. Jackson, stated in his deposition that opening a
NOTAM takes "[r]oughly about two minutes."  Jackson Dep., ex. O to Def.'s Mot. For
Summ. Judg. (Doc. #31) at 28 l. 3-5.  Furthermore, Mr. Fisher testified that the time
stamp on the NOTAM corresponds with the time Plaintiff called the FAA as reflected on
his phone records.  Fisher Dep., ex. L to Def.'s Mot. For Summ. Judg. (Doc. #31) at 58 l.
9-23.

drive-by the house to see if Plaintiff was there.  Plaintiff's Alltel vehicle was parked outside

the house around 3pm and remained there at 3:45 pm.  Mr. Fisher called Plaintiff and learned

that Plaintiff had been at the house since around 1pm.  Despite spending these hours tending

to personal matters, Plaintiff recorded the time as regular work.  Smith Timesheet, ex. 4 to

Fisher Declaration, ex. J to Def.'s Mot. For Summ. Judg. (Doc. #31).   Mr. Fisher informed

Plaintiff that he was going to recommend his termination to Mr. Rowe.  Plaintiff left his

house and confronted Mr. Fisher at the office.[11]  Mr. Fisher instructed Plaintiff to leave the

keys to his vehicle and have someone pick him up.  A subsequent search of Plaintiff's

company vehicle revealed, in relevant part, a beer bottle cap and receipts for alcohol

purchases.[12]

Mr. Fisher apprized Mr. Rowe of the problems he was having with Plaintiff on

January 6 and further investigated the incidents described above over the following weekend.

---

[11]      Mr. Fisher states that this meeting was very contentious and that Plaintiff
acted confrontational.  Fisher Declaration, ex. J to Def.'s Mot. For Summ. Judg. (Doc.
#31) at ¶ 17.   Plaintiff claims that Mr. Fisher was acting aggressively.  Smith Dep. at 85
l. 10-23.  Another witness to the incident, Sheila Rikerd, has stated that, while it
was apparent that both men were aggravated, no one raised their voices any more than usual
and it "never progressed to anything more than that."  *See* Rikerd Statement, ex. 9 to Pl.'s
Resp. (Doc. #34).

[12]      Plaintiff testified at his deposition that he has previously consumed alcohol
while driving his company vehicle and that the presence of the beer bottle cap may be
attributable to such conduct.  Smith Dep. at 161 l.7-13  ("Q:  Did you ever consume
alcohol when you were driving your vehicle?  A: Where I was drinking?  I mean, I have.
Q: Would that be the explanation for a Bud Light cap being found in your vehicle?  A: I
guess.").  Plaintiff subsequently submitted an affidavit in which he denies ever having
consumed alcohol while driving his company vehicle.  Smith Aff., ex. 12 to Pl.'s Resp.
(Doc. #34) at ¶11.

11

Mr. Fisher provided Mr. Rowe with a narrative of the issues described above, excepting the matter of Plaintiff's consumption of alcohol in a company vehicle, on January 8 (Sunday) and Messrs. Rowe and Green then resolved to terminate Plaintiff .  According to Messrs. Rowe and Green, each of the offenses attributed to Plaintiff were sufficient, standing alone, to warrant his termination.

Plaintiff contacted the EEOC through its Call Center sometime in 2006.  The EEOC subsequently sent Plaintiff a letter, dated May 11, 2006, that requested further information from Plaintiff.  The letter advised Plaintiff that his "contact with the Commission's National Call Center ***does not constitute the filing of a charge within the meaning of our statutes*** and that this agency will take no action until receipt of a writing bearing your signature."  Later, on August 20, 2007, a formal EEOC Charge of Discrimination was generated.  The charge states Plaintiff's belief that he was terminated because of his race and denies the allegations proffered as justification for his termination.  The charge also includes a notation that it is an "Amended charge - original document received May 10, 2006."  Upon concluding its investigation, the EEOC determined that it was "unable to conclude that the information obtained establishes violations of the statutes."  Accordingly, on February 26, 2008, the EEOC mailed Plaintiff a Notice-of-Right-to-Sue Letter and closed its file on Plaintiff's charge.  Plaintiff then filed the instant suit on May 27, 2008.

## III.    PLAINTIFF'S ALLEGATIONS OF DISCRIMINATORY CONDUCT

Although not expressly stated in his Amended Complaint, it appears from the

12

pleadings and evidence submitted in support of the pleadings that Plaintiff infers unlawful discriminatory termination from a series of purported actions and/or policies that, for Plaintiff, exemplify Defendant's discriminatory animus.   In particular, Plaintiff has emphasized his belief that Defendant failed to timely train him and provide necessary tools and equipment to permit him to do his job, and that Defendant provided such training and equipment to white employees prior to offering him access to such training and equipment. Plaintiff asserts that, rather than providing him with such training and equipment, his co-workers and supervisors simply treated him as if he was unable to do his job.  Plaintiff also cites a meeting in which Mr. Fisher, addressing all of the Network Technicians, forbade technicians from the practice of "riding together" unless the task at hand truly required two technicians.  Plaintiff, who had been frequently "riding" with Michael Jackson as they went about their job duties, believed that Mr. Fisher was singling out he and Mr. Jackson while announcing this policy, despite the fact that two white technicians frequently rode together and may have continued to do so after the meeting.[13]   For Plaintiff, these instances of perceived discriminatory conduct demonstrate that his termination, years later, was racially motivated.  Plaintiff also believes that some of the proffered reasons for his termination, including falsification of his time sheets and the NOTAM, using his company vehicle to conduct personal business well outside of his coverage area, and spending work hours at

---

[13]      In his deposition, Mr. Jackson stated that he did not feel singled-out by Mr. Fisher at this meeting.  *See* Jackson Dep., ex. O to Def.'s Mot. For Summ. Judg. at 20-21.

13

home, are pretextual, as other white employees engaged in similar conduct but were not terminated. Finally, in his response to Defendant's Motion for Summary Judgment, Plaintiff states his belief that Defendant is prejudiced against African-American employees who, as Plaintiff was doing at the time of his termination, build homes in largely white neighborhoods. Pl.'s Resp. (Doc. #34) at 23, 24.

## IV.   STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir.1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence

14

showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id*. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## V.    DISCUSSION

Defendant has moved for summary judgment on Plaintiff's Title VII and § 1981 claims. Discrimination claims predicated upon Title VII and § 1981 "have the same requirements of proof and use the same analytical framework, therefore [the Court] shall explicitly address the Title VII claim with the understanding that the analysis applies to the

§ 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Although Defendant proffers a number of reasons, both procedural and substantive, in support of its Motion, the Court will first analyze whether Plaintiff's claim of racial discrimination related to his termination is sufficient to withstand the analytical framework governing such claims.

Plaintiff alleges he was terminated on the basis of his race in violation of Title VII and 42 U.S.C. § 1981. Amended Complaint (Doc. #22) at ¶¶ 13, 15. Defendant contends that Plaintiff has failed to state a prima facie claim of racial discrimination related to his termination and that, even if he could state a prima facie case of discrimination, Defendant terminated Plaintiff's employment for legitimate, non-discriminatory reasons. Plaintiff asserts, in turn, that the reasons offered by Defendant in support of Plaintiff's termination are pretextual.

Title VII prohibits an employer from "discharg[ing] any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). "A prima facie claim of discrimination can be established three ways: 1) direct evidence; 2) circumstantial evidence; or 3) statistical proof." *Davis v. City of Panama City, Fla.*, 510 F. Supp. 2d 671, 681 (N.D. Fla. 2007) (citing *Earley v. Champion Int'l Corp.*, 907 F. 2d 1077, 1081 (11th Cir.1990)). Plaintiff has offered no direct evidence of racial discrimination by Defendant. Rather, Plaintiff relies upon the circumstantial evidence discussed above in attempting to prove his claim of discrimination. Accordingly, the Court must utilize the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.[14]

Under the *McDonnell Douglas* framework, to establish a prima facie case of race discrimination under Title VII the plaintiff must show: "(1) []he is a member of a protected class; (2) []he was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorably than [he] was treated; and (4) []he was qualified to do the job." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).[15]

Even if this Court assumes, *arguendo*, that Plaintiff has established a a prima facie

---

[14]    *See Standard*, 161 F.3d at 1332 ("When a plaintiff offers circumstantial evidence to prove a Title VII claim, we use the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [] (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual.").

[15]    The parties dispute the precise variant of the *McDonnell Douglas* standard that must be followed in assessing whether Plaintiff can establish a prima facie case of race discrimination.  Relying upon the fact that Plaintiff's position was filled by a white employee, Plaintiff contends that he need only show that he was replaced by someone outside of his protected class, rather than showing that similarly situated non-minority employees were treated more favorably than he.  Pl.'s Resp. (Doc. #34) at 21.  Indeed, there is abiding support for this position.  *See Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003).  However, the Court need not determine which formulation of the standard must be applied if Plaintiff's claim can be disposed of even assuming he has established a prima facie case.  *See Hanford v. The GEO Group*, 2009 WL 2562715 at *4 n.7 (11th Cir. Aug. 20, 2009).

case of racial discrimination, Defendant has provided the Court with legitimate, non-discriminatory reasons for terminating Plaintiff's employment.   Specifically, Defendant states that Plaintiff was terminated for 1) his unauthorized use of his company vehicle in traveling to Birmingham during work hours and returning with his wife; and 2) falsification of records, including time sheets for December 29 and January 6 and the NOTAM.  Def.'s Mot. For Summ. Judg. (Doc. #31) at 29; Def.'s Reply (Doc. #35) at 10.  While it is perhaps unclear exactly what Alltel vehicle use policy was in effect at the time of Plaintiff's termination, it is clear from the record that Plaintiff's recording of regular work hours during his trip to Birmingham, under the guise of "comp time," constituted a falsification of his time sheets pursuant to company policy.  Plaintiff has not provided any evidence that it was appropriate for him, even if he had been granted "comp time," to record those hours as regular work time.  It is also clear that Defendant's reason respecting the NOTAM is legitimate.  Defendant has a substantial interest in ensuring that its agents and employees carefully and fully comply with any reporting requirements mandated by federal regulatory agencies.  As the evidence in the record reflects, any employee's disregard for such reporting requirements is a very serious disciplinary matter.[16]  Thus, the uncontroverted evidence in

---

[16]     Plaintiff maintains that he did not report false information to the FAA. Although he never expressly denies opening the NOTAM, he insists that the duration of his call with the FAA was too brief for opening a NOTAM.  However, as discussed above, Mr. Jackson stated that opening a NOTAM takes "[r]oughly about two minutes" and Mr. Thaggard states that the FAA's timestamp on the NOTAM corresponds with the time that Plaintiff contacted the FAA.  Moreover, Plaintiff does not challenge any of the evidence in the record which establishes that, pursuant to Mr. Fisher's investigation, no

the record establishes that Defendant's proffered reasons for terminating Plaintiff are legitimate and non-discriminatory, and that each would have been sufficient, alone, to warrant Plaintiff's termination.   Thus, the burden shifts back to Plaintiff to discredit Defendant's proffered reasons as pretextual.

In order to survive summary judgment where the plaintiff asserts that an employer's proffered legitimate reasons for termination are pretext, the plaintiff must

> cast sufficient doubt on the defendant's proffered . . . reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct but were pretext for [the discriminatory action].   A plaintiff may show pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.   A plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.   In reviewing a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Corbitt v. Home Depot U.S.A., Inc.,* 573 F.3d 1223, 1248 (11th Cir. 2009) (internal quotations and citations omitted).

---

one other than Plaintiff opened the NOTAM.  In any event, the key consideration for a reviewing court is not necessarily the accuracy of the employer's stated reason for termination but, rather, the good faith belief of the employer in its given reason.   *See Robinson v. LaFarge North America, Inc.,* 240 F. App'x 824, 828 (11th Cir. 2007) (citing *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991)).  Plaintiff has given no reason why, based on Mr. Fisher's investigation of the NOTAM, Defendant could not have harbored a reasonable and good faith belief that Plaintiff provided the FAA with false information.

Plaintiff appears to assert that Defendant's proffered reasons for his termination are pretextual because they "are not worthy of credence."  Pl.'s Resp. (Doc. #34) at 22-23. Plaintiff points to purported "contradictions and inconsistencies" in the reasons given by Defendant for Plaintiff's termination during the meeting between Plaintiff and Mr. Fisher on January 6, on the "Employee Termination Form" in Defendant's personnel records, and in Defendant's representations to the Department of Industrial Relations during Plaintiff's unemployment compensation proceedings.  Specifically, Plaintiff maintains that Mr. Fisher failed to give him a reason for his imminent recommendation that Plaintiff be terminated at their meeting on January 6, 2006, but that Defendant proffered "misconduct" as the reason before the Department of Industrial Relations, and cited "Falsification of Documentation" on the company "Employee Termination Form."[17]  For Plaintiff, such purported "inconsistencies could lead a jury to determine that these reasons are merely pretext and the real reason is a bias against African-American employees who build big houses in predominately white neighborhoods."  Pl.'s Resp. (Doc. #34) at 23.  Thus, it appears Plaintiff

---

[17]     Citing *Mock v. Bell Helicopter Textron, Inc.*, 196 F. App'x 773, 774 (11th Cir. 2006), Plaintiff appears to rely on his assertion that Mr. Fisher allegedly failed to provide him with the reason for his recommendation that he be terminated as evidence that the reasons subsequently articulated by Defendant are pretextual.  However, *Mock* is inapposite.  First, it is apparent from the evidence in the record that Plaintiff was not terminated at the time of his meeting with Mr. Fisher.  That decision was made three days later by Messrs. Rowe and Green.  Second, there is no evidence that Defendant refused to provide the reason for the termination to Plaintiff at any time.

primarily seeks to persuade the Court through "indirect" evidence of pretext.[18]

Plaintiff has failed to prove pretext.  Plaintiff's "indirect" evidence of pretext - that Defendant has purportedly offered "inconsistent" reasons for his termination at varying times - is unavailing.  It is clear from the evidence in the record that the reasons behind Plaintiff's termination were clear on January 9 and are consistent with those given by Defendant in these proceedings.  *See* Email from Fisher to Gorham and Rowe, ex. 5 to Fisher Decl., ex. J to Def.'s Mot. For Summ. Judg. (Doc. #31) (includes narrative statement describing events on Dec. 29, Jan. 3, and Jan. 6).  *See also* Rowe Decl., ex. K at ¶¶4-7; Green Decl., ex. A at ¶¶7-8.  Thus, Plaintiff's reliance on the coded entry of "Falsification of Documentation" on the Termination Form (*see* Employee Termination Form, ex. 8 to Pl.'s Resp. (Doc. #34)) or

---

[18]     It might also be argued that Plaintiff's evidence - consisting largely of an affidavit from Burt Myrick, a former Alltel employee - respecting the purported "bias" of Alltel toward "African-American employees who build big houses in predominately white neighborhoods" constitutes, within the framework of the *Corbitt* language cited above, "direct" evidence of pretext.  However, to the extent Plaintiff intends it to be so construed, the Court does not find it persuasive evidence "that a discriminatory reason more likely motivated the employer."  *Corbitt*, 573 F.3d at 1248.

Mr. Myrick is an African-American former employee of Alltel who believes that he was terminated for building a home in "a predominately white neighborhood." However, his statements in this regard are mere speculation about the motives of those that determined to terminate his employment.  Moreover, the persons described in Mr. Myrick's affidavit as harboring racial animus toward him are completely distinct from those at issue in the instant matter.  Thus, the Court fails to see the relevance of the Myrick evidence to this case.  To the extent Plaintiff provides this evidence for corroboration of his apparent belief that there is an overarching discriminatory animus toward African Americans who build homes in "predominately white neighborhoods," the Court finds it unpersuasive because it is self-serving, is grounded on naked speculation about the motives of Alltel decision makers, and is unsupported by any other relevant evidence.

the notation of "misconduct" on the Department of Industrial Relations' "Notice of Determination" (*see* Notice of Determination, ex. 6 to Pl.'s Resp. (Doc. #34)) as evidence of purported "contradictions or inconsistencies" is misplaced.  Defendant's articulated reasoning for terminating Plaintiff's employment has been substantially consistent at all relevant times.

Moreover, if the Court were to infer that Plaintiff believes the proffered reasons for his termination constitute pretext because similarly situated, non African-American employees have not been terminated for similar conduct, such claim is still without merit. While Plaintiff has testified that other employees have spent work hours at home, including on January 6, 2006, or otherwise handled personal business during work hours, he has produced no evidence concerning such employees' falsification of their time sheets. Furthermore, Plaintiff has not produced any evidence that any other employee reported false information to the FAA when opening a NOTAM or that Defendant's belief that Plaintiff did so was unreasonable or lacking good faith.  Thus, Plaintiff has failed to show that any of the proffered legitimate reasons for his termination were pretextual.

Furthermore, an additional, and fundamental, reason why Plaintiff has failed to show pretext is his failure to produce any evidence that the persons who actually decided to terminate his employment, Messrs. Rowe and Green, "harbored racial animus toward him."

22

*Hanford*, 2009 WL 2562715 at *4.[19]  In his original complaint, Plaintiff listed only Mr. Fisher as one who allegedly discriminated against him.  Complaint (Doc. #1) at 2.  Indeed, it was Mr. Fisher who conducted the investigation of events which led to Plaintiff's termination and recommended to Messrs. Rowe and Green that Plaintiff be terminated.  The Eleventh Circuit has previously recognized that "a biased discharge recommendation by an individual with no actual power to discharge may be actionable if the plaintiff can prove the biased recommendation directly resulted in the plaintiff's discharge."  *Hanford*, 2009 WL 2562715 at *4 (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)).  However, the plaintiff must prove direct causation - that the discriminatory animus underlying the recommendation, and not any asserted employee misconduct, caused the decision to terminate.  *Id.*  One method recognized by courts to achieve this is by demonstrating that there was no "independent" investigation by the decision makers after receiving the recommendation from the allegedly biased party.  *Id.*

Plaintiff has failed to produce any evidence of such causation.  Plaintiff does not challenge evidence in the record which establishes that Messrs. Rowe and Green independently determined that Plaintiff should be terminated based on their own review of

---

[19]    The only evidence of racial animus offered by Plaintiff as to Mr. Rowe is Plaintiff's deposition testimony that he felt Mr. Rowe had failed to get him necessary equipment during a time period ending in 2001.  *See* Smith Dep. at 208 l.4 - 209 l.11.  Plaintiff specifically denies any discriminatory treatment from Mr. Rowe outside of the time during which Mr. Rowe conducted Plaintiff's evaluation in 2001.  *Id.* at 209 l.21 - 210 l.3.  Plaintiff has made no allegation of discriminatory conduct against Mr. Green.

the information they were provided and their subsequent collaboration.  The mere fact that Plaintiff's termination could not have occurred without the approval of Mr. Green, against whom Plaintiff has alleged no discriminatory animus, demonstrates the insulation from the alleged discriminatory conduct of Mr. Fisher and Mr. Rowe which Plaintiff enjoyed.  *Id.* at 5.  In short, Plaintiff "has not presented any evidence suggesting [Messrs. Rowe and Green were] influenced by [Mr. Fisher's] alleged discriminatory animus or that [their] decision was based on anything other than [their] independent review of [Mr. Fisher's] recommendation[] and [their] own judgment."  *Id.*  Without evidence of such causation, Plaintiff's charge that Defendant's reasons for terminating his employment were pretextual must fail.

In sum, assuming that Plaintiff has established a prima facie case of racial discrimination flowing from his termination, itself a dubious assumption, Plaintiff has not demonstrated that a reasonable fact finder could determine that the legitimate, non-discriminatory reasons given for his termination are pretextual.  Accordingly, he can not withstand summary judgment on his discrimination claim.[20]

## VI.    CONCLUSION

For the reasons specified above, the Magistrate Judge RECOMMENDS that the

_____

[20]    The undersigned is also mindful that, in this Circuit, "[t]he ultimate question in a disparate treatment case is not whether the plaintiff established a *prima facie* case or demonstrated pretext, but whether the defendant intentionally discriminated against the plaintiff." *Nix v. WLCY Radio/Rahall Commc's*, 738 F.2d 1181, 1184 (11th Cir.1984) (internal quotations omitted).  Thus, even after undertaking the pretext analysis above, the Court has reviewed the entire record in consideration of the Motion for Summary Judgment and finds that there was no intentional discrimination against Plaintiff.

Motion for Summary Judgment (Doc. #31), be GRANTED and this case be DISMISSED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation by **November 16, 2009**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 3rd day of November, 2009.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE

25